IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHIRLEY RUPERT,                    :
                                   :
Plaintiff,                         :        Case No. 05-CV-1022
                                   :
       v.                          :
                                   :        (Judge McClure)
THE PRUDENTIAL                     :
INSURANCE COMPANY,                 :
                                   :
Defendant.                         :

**M E M O R A N D U M**

April 7, 2006

**BACKGROUND:**

On May 19, 2005, plaintiff Shirley Rupert ("Rupert") filed a complaint

against defendant The Prudential Insurance Company ("Prudential").  Plaintiff's

action arises under the Employee Retirement Income Security Act of 1974

("ERISA").  This court has jurisdiction pursuant to 29 U.S.C. § 1132(e).  Plaintiff

seeks to recover long-term disability benefits, and the court's clarification of her

entitlement to future benefits under her Plan.  See 29 U.S.C. § 1132(a)(1)(B).

Both parties' cross motions for summary judgment are fully briefed and ripe

for our review.  For the following reasons we will grant defendant's motion for

summary judgment, deny plaintiff's motion for summary judgment, and enter

1

judgment in favor of defendant Prudential and against plaintiff Rupert.

**DISCUSSION:**

## I.  LEGAL STANDARD

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"If the nonmoving party has the burden of persuasion at trial, 'the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'" Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989) (quoting Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d. Cir. 1987)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In evaluating a motion for summary judgment the court will draw all reasonable inferences from the evidence in the record in favor of the nonmoving party.  Am. Flint Glass Workers Union v. Beaumont Glass Co., 62 F.3d 574, 578 (3d Cir. 1995).  The nonmoving party, however, cannot defeat a motion for summary judgment by merely offering general denials, vague allegations, or

conclusory statements; rather the party must point to specific evidence in the record that creates a genuine issue as to a material fact.  See Celotex, 477 U.S. at 32; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).

## II.  STATEMENT OF FACTS

In this case we have cross motions for summary judgment.  Fortunately, the facts relating to both motions can be synthesized under a single statement of the facts.

A.  Undisputed Background Facts

Plaintiff Shirley Rupert was an employee of the Centre Daily Times ("Daily Times"), a subsidiary of Knight Ridder, Inc., and began her employment on July 14, 1982.  As an employee of the Centre Daily Times, Rupert purchased through her employer a long-term disability policy with the defendant Prudential. Deductions were taken from Rupert's pay and the Daily Times was responsible for paying the insurance premium for Rupert's disability insurance policy to Prudential. Prudential is an insurance company that both funds and administers the plan.

Beginning in May 2002 Rupert began seeing her family physician Dr. Michael Greenberg for headaches.  On May 31, 2002 an MRI of the cervical spine was conducted on Rupert.  Conclusions drawn from the MRI were that Rupert suffered

from "mild spondylosis at C5-C6 and C6-C7."  (Rec. Doc. No. 22, at PRU 168.)

The report also indicated that there was some loss of depth of the canal in the AP

direction at C5-C6, but there was no evidence for cord compression.  The MRI

also revealed that there was bilateral neural foraminal narrowing, and at the C6-C7

there was mild right-sided neural foraminal narrowing.  (Rec. Doc. No. 22, at PRU

168.)

On June 19, 2002, Rupert stopped working as the circulation business

manager for the Daily Times due to headaches.[1]  During the Summer of 2002

Rupert continued treatment with Dr. Greenberg who recommended that she avoid

the stress of work until her condition improved.  On September 10, 2002, Dr.

Greenberg noted he doubted Rupert would ever return to work due to the

incapacitating headaches.

On October 4, 2002, Rupert filed a claim for long-term disability under

Group Contract 74600 ("Policy") issued to her employer's parent company,

Knight-Ridder, Inc.  She submitted this claim as a result of her diagnosis of

headaches and degenerative joint disease.   As part of this application Dr.

---

[1]Rupert adds that she stopped working because she was suffering due to degenerative joint disease, cervical subluxation and cervical disc degeneration.

Rupert was initially placed off work April 1, 2002 through April 29, 2002 and then returned to work part-time before she completely stopped working.

Anothony Marrar's attending physician statement was included.  That statement indicated diagnoses of multiple cervical subluxations, cervical disc degeneration, and cephalalgia.  (Rec. Doc. No. 22, at PRU 92-94.)  On November 21, 2002, defendant denied plaintiff's claim for benefits.  (Rec. Doc. No. 22, at PRU 314-16.)  In denying plaintiff's claim for benefits, defendant summarized as follows:

> We have determined that your medical condition would not prevent you from performing the material and substantial duties of your occupation.  The objective exams submitted only indicate mild changes in your neck. Although you may continue to experience symptoms that may require ongoing treatment for your condition, the medical information on file does not provide evidence of an impairment which would render you Totally Disabled from performing the duties of your own occupation as a Circulation Business Manager.  Therefore, your Long Term Disability claim has been Disallowed effective November 22, 2002.

(Rec. Doc. No. 22, at PRU 315.)

During the fall of 2002 Rupert continued following up with Dr. Greenberg for headaches.  On November 14, 2002, a colonoscopy was performed on Rupert with an impression of colitis.  (Rec. Doc. No. 22, at PRU 133.)  On November 21, 2002, defendant's claim examiner spoke with Rupert who indicated that she had only been to a neurologist once.  (Rec. Doc. No. 22, at PRU 375.)  She also advised the examiner that she continued to have headaches and other forms of

debilitating pain. (Rec. Doc. No. 22, at PRU 375.)

Rupert appealed Prudential's initial decision on January 15, 2003.  On February 28, 2003, Dr. Greenberg drafted a letter advising that Rupert had been seen by numerous specialists and the consensus of the physicians who had seen her was that Rupert's headaches were secondary to a neurovascular component as well as a degenerative disease affecting her cervical spine.  (Rec. Doc. No. 22, at PRU 87.)  He also stated in that document that he doubted that Rupert would be able to return to any occupation for which she was suitably trained.  (Rec. Doc. No. 22, at PRU 87.)  On March 24, 2003, Prudential upheld its decision to deny plaintiff's claim for long term disability benefits.  (Rec. Doc. No. 22, at PRU 318-20.)

Three days earlier on March 21, 2003, and independent of Rupert's claim for benefits from Prudential, Rupert was examined by Dr. Gregory Neurudian on behalf of social security disability.  (Rec. Doc. No. 22, at 76-78.)  Dr. Neurudian summarized that Rupert had "some type of neuromuscular migraine disorder, who has attacks frequently during the week, who has not gained relief from her medication, who has in addition, a mitral valve prolapse with irregular heartbeat." (Rec. Doc. No. 22, at PRU 78.)  Throughout April and May Rupert continued follow up visits with Dr. Greenberg regarding her headaches and cervical condition.

6

(Rec. Doc. No. 22, at PRU 182-83.)

On June 19, 2003, Rupert visited surgeon Dr. Nicholas DiCuccio.  In his notes describing Rupert's first visit with him, Dr. DiCuccio noted that "[t]his patient is completely disabled from a multi-faceted medical standing and should be on Social security disability."  (Rec. Doc. No. 22, at PRU 115.)  His initial impressions were that Rupert had intractable neck pain, advancing degenerative disk disease of spine, systemic arthritis, osteoporosis, colitis, and intractable pain.  (Rec. Doc. No. 22, at PRU 114.)

On June 20, 2003, an ALJ found that Rupert had met the disability insured status requirement of the Social Security Act from June 20, 2002 to December 31, 2007.  (Rec. Doc. No. 22, at PRU 63-69.)

On July 29, 2003, Dr. DiCuccio saw Rupert and found that:

> She has been doing fair.  The patient denied any
> excessive difficulty.  The medications for her gut has
> been helping.  The patient is doing excellently.  She is not
> having any other difficulties.  The arthritis still gives her
> tremendous amount of problems with pain on the right
> side of her neck and it radiates down into her hand
> causing a lot of difficulties with this area.
>
> . . . .
>
> Patient is totally disabled and Social Security Disablity
> has been achieved.  Her private insurance also disabled
> the patient.

7

(Rec. Doc. No. 22, at PRU 115.)

Rupert submitted a request for administrative reconsideration on August 7, 2003.  (Rec. Doc. No. 22, at PRU 83.)  As part of that request Rupert's counsel noted that Rupert has been approved for social security disability and that in Dr. DiCuccio's opinion she was totally disabled.  (See DiCuccio's July 30, 2003 Letter, Rec. Doc. No. 22, at PRU 81-82).  In August and September Rupert followed up with Dr. Greenberg.  In September, October, November, and December of 2003, Rupert followed up with Dr. DiCuccio.[2]  (Rec. Doc. No. 22, at PRU 116-17.)

On September 8, 2003, Prudential requested that Rupert provide additional documentation in the form of physical examination findings, test results, or data to support the opinion that she was unable to work.  Plaintiff did not provide any further medical documentation and requested a prompt decision.  (Rec. Doc. No. 22, at PRU 70-71.)  On December 18, 2003, two of defendant's claim handlers evaluated Rupert's claim on appeal.  (Rec. Doc. No. 22, at 361-62.)  On January 8, 2005, Prudential upheld its initial decision.  (Rec. Doc. No. 22, at PRU 326-28.)

In that document Prudential stated:

In summary, the medical documentation in file indicates

---

[2]DiCuccio's notes are illegible from these dates.

> that although Ms. Rupert may experience discomfort
> from her conditions, the documentation does not support
> that they impair her ability to perform her regular
> occupation.  Therefore, we have upheld our decision to
> disallow her claim.

(Rec. Doc. No. 22, at PRU 327.)

In January and February of 2004, Dr. DiCuccio found the impression of intractable neck pain (degenerative disk disease; osteophytic spurs; lateral ligament calcifications), possible collagenous colitis, systemic arthritis, probable seronegative rheumatoid arthritis, advanced degenerative disk disease of the spine, osteoporosis, intractable pain syndrome, and hyperlipidemia.  (Rec. Doc. No. 22, at PRU 117.)  This impression is repeated in Dr. DiCuccio's March and April 2004 notes.  (Rec. Doc. No. 22, at PRU 119-21.)

On April 2, 2004, Rupert appealed the decision to Prudential's Appeals Committee for a final decision.  (Rec. Doc. No. 22, at PRU 61.)  On June 22, 2004, plaintiff submitted additional medical documentation in support of her appeal. (Rec. Doc. No. 22, at PRU 60.)  On July 8, 2004, Prudential submitted all of plaintiff's medical documentation in the file, in addition to those received on appeal, to Dr. Jonathan Rutchik for a file review.  On August 5, 2004, Dr. Rutchik rendered his independent medical file review.  (Rec. Doc. No. 22, at PRU 37-44.)  In relevant part Dr. Rutchik stated:

> Regarding your specific question, I do not feel that
> doctors noted her difficulties adequately to support her
> disability with objective findings or clear explanation of
> her abilities related to her headache between April and
> December 2002.  Rarely, if at all, medical documentation
> described the patient's abilities in hours per day and days
> per week or specific tasks that she accomplishes when
> she is not working.  The first note that is clear begins with
> Dr. Greenberg's note of February of 2003.  It is difficult
> to state that it is retrospective.

(Rec. Doc. No. 22, at PRU 38.)

On August 12, 2004, the Appeals Committee reviewed the file review and found

that it supported  benefits based on some of the claimant's diagnoses.  (Rec. Doc.

No. 22, at PRU 365.)  The Appeals Committee expressed concern that impairment

from some of the diagnoses like rheumatoid arthritis and colitis were not addressed.

(Rec. Doc. No. 22, at PRU 365.)  Thereafter, Prudential sent Dr. Rutchik's file

review to plaintiff's physicians, Dr. DiCuccio and Dr. Greenberg, and requested

their opinion as to plaintiff's ability to perform sedentary work with the ability to

change positions from the date she went out of work to the present.  (Rec. Doc.

No. 22, at PRU 338-40.)

On September 9, 2004, Dr. DiCuccio rendered his opinion.  (Rec. Doc. No.

22, at PRU 28.)  In relevant part Dr. DiCuccio stated that:

> She is incapable of sedentary work since she has to
> change positions extremely quickly and more frequently

> at a rate of about every 15 minutes. . . .  It is my firm
> opinion that the patient's spine x-rays show the patient's
> extensive disease and shows her inability to perform even
> sedentary work. . . . The patient does not feel that she
> can sit there for one hour. . . .  Therefore, as I have
> stated, I can not medically release her back to work.

(Rec. Doc. No. 22, at PRU 28.)

On September 15, 2004, Dr. Greenberg rendered his opinion.  (Rec. Doc. No. 22,

at 20-23.)  In relevant part Dr. Greenberg stated that:

> In summary, and with a reasonable degree of medical
> certainty, Shirley Rupert has been totally disabled since
> 20 June 2002 due to multifactorial headaches as well as
> decreased cognition and memory with the medicine
> required to control these headaches.  Her condition has
> deteriorated to the point where she is totally and
> permanently disabled for any occupation for which she is
> reasonably suited by education, training or experience.

(Rec. Doc. No. 22, at PRU 23.)

On October 21, 2004, Prudential approved Rupert's claim for a closed

period of December 17, 2002 through December 16, 2004 based on Rupert's

conditions, including headaches and depression.  (Rec. Doc. No. 22, at PRU 348.)

In that same correspondence Prudential determined Rupert was not eligible for

long-term benefits past the first 24 months of payments.  In relevant part Prudential

stated:

> We then assessed Ms. Rupert's eligibility for LTD

benefits after 24 months.  In order to be eligible for these benefits, Ms. Rupert would have to be impaired by her physical condition (with the exception of those based on self reported symptoms as noted above [headaches and depression]) from performing the duties of any gainful occupation for which she is reasonably fitted by education, training or experience.

As noted above, Dr. Greenberg indicated Ms. Rupert is impaired from her headaches and medications for same. This, along with her depression, stress, and chronic pain would fall under the self reported symptoms and mental nervous benefit limitation as quoted above.  We do not find that any of Ms. Rupert's other physical diagnosis support total disability from any occupation.

Dr. DiCuccio indicates multiple conditions, primarily her spinal condition and rheumatoid arthritis, as well as collagenous colitis, and osteoporosis.

With regard to her spinal condition, we do not find sufficient evidence that this would impair her after December 16, 2004.  We again noted that while Ms. Rupert has multiple arthritic changes in her spine, there is no evidence of neurological deficit secondary to these arthritic changes.  Ms. Rupert does have some cervical symptomology, but it does not rise to a level of severity to render her totally disabled from any occupation.  The arthritic changes in her lumbar spine are age appropriate and would not render her totally disabled from sedentary work which would allow periodic positional changes.

Additionally, the medical documentation does not support that Ms. Rupert's diagnosis of sero-negative rheumatoid arthritis impairs her ability to perform sedentary work.  Dr. Greenberg's letter notes that beyond the cervical findings, the remaining physical examination

was "unremarkable."

Additionally, it does not appear that Ms. Rupert is under regular care for her multiple conditions, as noted in our file review and prior assessments.

(Rec. Doc. No. 22, at PRU 348-49.)

## B.  Relevant Plan Language

The relevant policy language includes:

You are disabled when Prudential determines that:

! you are unable to perform the *material and substantial duties* of your *regular occupation* due to your *sickness* or *injury*; and
! you have a 20% or more loss in your *indexed monthly earnings* due to that *sickness* or *injury*.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

. . . .

*Material and substantial duties* means duties that:

! are normally required for the performance of your regular occupation; and
! cannot be reasonably omitted or modified.

(Rec. Doc. No. 22, at PRU 250.)

The policy also states that certain disabilities have a limited pay period under

13

the Plan.  In relevant part the policy states:

> Disabilities due to a sickness or injury in which, as determined by Prudential, are primarily based on ***self-reported symptoms*** have a limited pay period during your lifetime.

> Disabilities which, as determined by Prudential, are due in whole or part to ***mental illness*** also have a limited pay period during your lifetime.

> The limited pay period for self-reported symptoms and mental illness combined is 24 months during your lifetime.

> . . . .

> ***Self-reported symptoms*** means the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine.  Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

(Rec. Doc. No. 22, at 258-59.)

The plan also requires a claimant present certain information for proof of a claim, including that the claimant is "under the ***regular care*** of a ***doctor***."  (Rec. Doc. No. 22, at PRU 263.)  The policy language provides the following definitions:

> Regular care means:

> **!** you personally visit a doctor as frequently as is medically required, according to generally accepted

14

medical standards, to effectively manage and treat your
disabling condition(s); and

! you are receiving the most appropriate treatment and
care, which conforms with generally accepted medical
standards, for your disabling condition(s) by a doctor
whose specialty or experience is the most appropriate for
your disabling condition(s), according to generally
accepted medical standards.

Doctor means:

a person who is performing tasks that are within the limits
of his or her medical license; and

> ! is licensed to practice medicine and prescribe
> and administer drugs or to perform surgery; or

> ! has a doctoral degree in Psychology (Ph.D. or
> Psy.D.) whose primary practice is treating patients;
> or

> ! is a legally qualified medical practitioner
> according to the laws and regulations of the
> governing jurisdiction.

(Rec. Doc. No. 22, at PRU 264.)

## III.  APPLICABLE STANDARD OF REVIEW

Under ERISA, a court reviewing an administrator's decision to deny benefits

is by default reviewed de novo, "unless the benefit plan gives the administrator or

fiduciary discretionary authority to determine the employee's eligibility or construe

the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115

15

(1989); <u>Stratton v. E.I. DuPont De Nemours & Co.</u>, 363 F.3d 250, 253 (3d Cir.

2004).  If a plan provides discretionary authority to the administrator or fiduciary,

then a reviewing court applies a form of arbitrary and capricious review.  <u>Firestone</u>

<u>Tire & Rubber Co.</u>, 489 U.S. at 111-12, 115; <u>see</u> <u>Mitchell v. Eastman Kodak Co.</u>,

113 F.3d 433, 437 (3d Cir. 1997).  Discretionary authority can be provided for by

expressed or implied language in the benefit plan.  <u>Luby v. Teamsters Health,</u>

<u>Welfare, & Pension Trust</u>, 944 F.2d 1176, 1180 (3d Cir. 1991).  Whether that

arbitrary and capricious review is heightened in any way depends on the presence

of potentially conflicted ERISA fiduciaries and is determined on a sliding scale.

<u>Pinto v. Reliance Standard Life Ins. Co.</u>, 214 F.3d 377, 379 (3d Cir. 2000).

The scope of discovery depends on the standard of review.  In the Third

Circuit, "a district court exercising de novo review over an ERISA determination

between beneficiary claimants is not limited to the evidence before the Fund's

Administrator."  <u>Luby</u>, 944 F.2d at 1184-85.  In sharp contrast, the record available

to a court conducting an arbitrary and capricious review is the record made before

the plan administrator, which cannot be supplemented during litigation.  <u>See</u> <u>Kosiba</u>

<u>v. Merck & Co.</u>, 384 F.3d 58, 67 n.5 (3d Cir. 2004) (citing <u>Mitchell</u>, 113 F.3d at

440).  Nevertheless, when a reviewing court is deciding whether to employ the

arbitrary and capricious standard or a more heightened standard of review, it may

consider evidence of potential biases and conflicts of interest that are not found in the administrator's record.  Id.  Plaintiff has provided the court with excerpts from Current Medical Diagnosis & Treatment (Lawrence M. Tierney Jr., Stephen J. McPhee & Maxine A. Papadakis eds., 45th Ed. 2006).  As we discuss below, we are conducting a form of arbitrary and capricious review and therefore the record cannot be supplemented with excerpts from this treatise, and the court will not consider these excerpts, because the documents did not appear before the plan administrator.

### A.  Moderately Heightened Arbitrary & Capricious Standard of Review

The parties stipulate that Prudential is "operating as an insurance company who both determines eligibility benefits and pays benefits out of it's [sic.] own funds and accordingly, Pinto's sliding scale of review applies."  (Stipulation, Rec. Doc. No. 19, at 2.)  The language of the Plan provides that a claimant is disabled when "Prudential determines" the existence of certain factors.  (Rec. Doc. No. 22, at 250.)  This languages provides Prudential with the discretionary authority to determine whether Rupert is disabled.  The parties agree that Prudential both funds and administers the Plan, which creates a conflict that warrants a heightened form of arbitrary and capricious review.  Pinto, 214 F.3d at 378.

The Third Circuit follows a sliding scale approach to applying an arbitrary

and capricious review.  The sliding scale allows for the court to intensify its

scrutiny of the insurer's decision to match the degree of conflict present in the

insurer's decision making process.  See Pinto, 214 F.3d at 392.  In Pinto, the

United States Court of Appeals for the Third Circuit provided four factors for

courts to consider in determining the exact degree of scrutiny.  Id.  Those factors

are: "(1) the sophistication of the parties; (2) the information accessible to the

parties; (3) the exact financial arrangement between the insurer and the company;

and (4) the status of the fiduciary, as the company's financial or structural

deterioration might negatively impact the 'presumed desire to maintain employee

satisfaction.'" Stratton, 363 F.3d at 254 (citing Pinto, 214 F.3d at 392).  The Third

Circuit stated in Pinto that they "expect district courts to consider the nature and

degree of apparent conflicts with a view to shaping their arbitrary and capricious

review of the benefits determinations of discretionary decisionmakers." 214 F.3d at

393.  Courts should consider the process by which the administrator arrived at the

decision.  Id.  If review of the process reveals suspicious events or procedural

anomalies then the court's review should be heightened.  Id.

The parties dispute exactly how heightened our review should be on Pinto's

sliding scale.  Defendant argues that there are absolutely no procedural anomalies,

examples of bias, or suspicious events that would warrant a heightened form of

18

review beyond the inherent structural conflict.  <u>See</u> <u>Lasser v. Reliance Standard</u>

<u>Life Ins. Co.</u>, 344 F.3d 381, 385 (3d Cir. 2003).  Plaintiff contends "numerous

procedural irregularities exist that warrant 'ratcheting up' the review of this case to

the heightened, arbitrary and capricious standard."  (Rec. Doc. No. 21, at 16.)

1.  <u>No Procedural Anomalies Were Present in Prudential's</u>
<u>November 2002 and March 2003 Decisions</u>

First, Rupert contends that Prudential's procedure in denying Rupert's initial

administrative claim for benefits warrants heightened review.  Apparently Rupert

takes issue with Prudential's administrative decisions dated November 21, 2002 and

March 24, 2003.

Rupert contends that Prudential summarily rejected the opinions of Rupert's

treating physicians without any medical evidence to the contrary.  Rupert notes that

Prudential rejected the claim on the conclusion that the objective examination

submitted by Rupert only indicated mild changes in her neck and that the medical

evidence provided did not provide evidence of an impairment which would leave

Rupert unable to perform her occupation.  Rupert acknowledges that Prudential

relied on the conclusion of an MRI test performed on Rupert that found she

suffered from mild spondylosis; but she objects to Prudential not giving greater

weight to the detailed information contained in the MRI and the results of physical

exams of the plaintiff that found she had a decreased range of motion and significant headaches.  In that initial November 22, 2002 rejection of Rupert's claim Prudential also noted that no referrals to specialists had been made.  (Rec. Doc. No. 22, at PRU 315.)  Plaintiff also objects to the defendant's initial rejection of Dr. Greenberg's February 28, 2003 report, (Rec. Doc. No. 22, at PRU 87), on the grounds that objective testing did not support treating physician Greenberg's opinion of the severity of Rupert's condition (Rec. Doc. No. 22, at PRU 319).

Rupert contends that Prudential used an employee to conduct only a cursory review of medical records to deny her claim and that Prudential arbitrarily refused to credit Rupert's reliable evidence.  The record belies her argument.  A fatal flaw in plaintiff's argument is that she has placed the burden on Prudential to disprove that she was disabled under the terms of the Plan.  This is simply not appropriate. The record indicates that Prudential denied Rupert's claim for benefits and her initial reconsideration of that claim because she failed to provide the objective medical evidence that supported the opinions of her treating physicians.

Despite Rupert's claims, it is clear to the court that there was nothing procedurally anomalous in Prudential's handling of the initial administrative decisions of November 22, 2002 and March 24, 2003.  Prudential noted in its November 22, 2002 decision that the objective medical evidence indicated only

mild changes in Rupert's neck; the MRI indicated only minimal degenerative changes to her neck.  In the March 24, 2003 decision, Prudential noted that Rupert had failed to provide documents relating to specialist consultations and reflecting other treatment cited by Dr. Greenberg in his February 28, 2003 report.  (Rec. Doc. No. 22, at 319.)  Prudential also noted that although Dr. Greenberg had stated that Rupert was unable to drive he had not revoked her license and he did not comment on Rupert's ability to carry out daily activities with the limitations of her neck condition.  It was plaintiff's obligation to provide Prudential with objective medical evidence that would support Rupert's claim that she was eligible for long-term disability benefits.  There was nothing that Prudential did in its decisions of November 21, 2002 and March 24, 2003, that warrants a more heightened standard of review under <u>Pinto</u>.

2.  Prudential's January 8, 2004 Decision
Does Not Warrant Heightened Review

Next, Rupert contends that Prudential's denial of her second request for reconsideration of Rupert's claim for long-term disability benefits also supports stricter scrutiny of our review under Pinto's decision.  Rupert contends that the decision demonstrates a selective and self-serving analysis of the medical record evincing an adversarial posture from Prudential.

21

Again we find that the record does not support Rupert's contentions. Rupert states that the January 8, 2004, decision makes "no reference to a decision granting social security disability benefits." (Rec. Doc. No. 21, at 19.) The January 8, 2004 letter, however, clearly states that Prudential was in receipt of a "Social Security Disability Benefits (SSDB) approval letter." (Rec. Doc. No. 22, at PRU 327.) The significance of a favorable Social Security finding also has limited weight in the ERISA context. The United States Supreme Court has held that under ERISA a plan administrator is under no obligation to afford deference to a treating physician's opinion, this in contrast to the treating physician rule that governs social security cases.[3]  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 829 (2003); Stratton, 363 F.3d at 257-58.

We cannot agree with plaintiff's characterization of Prudential's handling of her claim as adversarial. In Prudential's January 8, 2004 decision the insurance

---

[3]Rupert cites to Edgerton v. CNA Ins. Co., 215 F. Supp. 2d 541 (E.D. Pa. 2002), in support of her claim that the social security ALJ's decision is a factor that should be considered by the ERISA plan administrator. Although we agree that it is a factor that should be considered, the significance of Edgerton's discussion about rationale for applying the Social Security treating physician rule in the ERISA context cannot be followed. Edgerton cites to the Ninth Circuit's decision in Regula v. Delta Family-Care Disability Survivorship Plan, 266 F.3d 1130, 1139 (9th Cir. 2001), for the appropriateness of applying the social security treating physician rule in the ERISA context. As noted above, in 2003, the Supreme Court abrogated Regula in Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003).

company reiterated that claimaint's attorney continued to not provide the necessary

documentation.  In relevant part the January 8, 2004 decision states:

> We reviewed the documentation provided, and advised
> you that additional documentation, including actual office
> visit notes, test results, and information on any mental
> health treatment would be needed to evaluate the claim.
> You provided the test results, but declined to provide the
> additional documentation, and instead requested we
> review the claim based on the documentation in file.

(Rec. Doc. No. 22, at PRU 327.)

There is nothing in Prudential's January 8, 2004 decision which would suggest an

improper bias in handling Rupert's claim.  We do not find a reason to heighten our

review under <u>Pinto</u>'s sliding scale based on the facts of the January 8, 2004

decision.

3.  The Appeals Committee Review Process

Finally, Rupert contends that the Prudential Appeals Committee's handling

of Rupert's claims warrants a more heightened review of the insurance company's

decision to deny her long-term benefits.  On April 2, 2004, Rupert initiated her final

administrative appeal.  The Committee recommended an independent medical file

review be conducted by a neurologist.  That review was conducted by Dr. Rutchik.

Rupert contends that Prudential inappropriately directed Rutchik to limit his review

to the period of June 20, 2002 to December 16, 2002.  We cannot agree that

Prudential inappropriately instructed Dr. Rutchik.  Although the letter to Dr.
Rutchik requests specific information about Rupert's ability to work during that
time period, it also asks for Rutchik's opinion as to "any subsequent changes to
those restrictions and limitations."  (Rec. Doc. No. 22, at PRU 334.)  Furthermore,
Dr. Rutchik conducted a complete review of the medical file.

      Rupert makes much of the fact that Prudential continued to contact Dr.
Greenberg and Dr. DiCuccio, but that in spite of the information Prudential
received from these treating physicians it reached a contrary conclusion.  The fact
that the insurance company continued to seek responses from Rupert's treating
physicians after Dr. Rutchik conducted his independent review only speaks to the
absence of bias on the part of Prudential.  The record indicates that even at the
Appeals Committee review stage Prudential was attempting to discover information
from Rupert's counsel which was not provided after previous requests, i.e.,
whether Rupert was seeing a mental health provider. (Rec. Doc. No. 22, at PRU
364.)

      Rupert does note one instance in the Appeals Committee process that we
believe warrants a moderately heightened review under Pinto.  On October 7, 2004,
the Appeals Committee reviewed Rupert's claim and decided that they wanted
clarification of Dr. DiCuccio's letter where it was indicated that Rupert's spinal

cord was "fused" and Dr. DiCuccio's diagnosis of Rupert with rheumatoid arthritis.  (Rec. Doc. No. 22, at PRU 368.)  On that date the Appeals Committee determined that its Dr. Fallon should contact Dr. DiCuccio to clarify these issues. On October 12, 2004, after reviewing the x-ray, MRI, social security evaluation, Dr. Rutchik's file review, and the two treating physicians' responses to the file review, Dr. Fallon indicated that it was unclear why Dr. DiCuccio found that Rupert's spine was "fused."  Dr. Fallon noted there was no evidence of spinal fusion and that the call to Dr. DiCuccio was not needed.  (Rec. Doc. No. 22, at PRU 369.)  Later that day the claim manager determined that the claim should be approved for the initial two-year period and that the Appeals Committee should determine any additional steps needed to render a determination on the claimant's eligibility for benefits beyond December 16, 2004.  (Rec. Doc. No. 22, at 370.)  On October 21, 2004, the Appeals Committee reviewed the information and determined it was appropriate to approve the claim for the initial period and terminate effective December 17, 2004.

We will heighten our review of Prudential's decision under moderately heightened scrutiny for the following reason.  The Appeals Committee's notes make no explanation for why they believed it was acceptable for Dr. Fallon to simply determine it was unnecessary to contact Dr. DiCuccio after they

recommended that Dr. Fallon contact Dr. DiCuccio for clarification.  This raises

the appearance of an improper handling of the claim because Dr. Fallon indicated

that it was "unclear exactly what Dr. DiCuccio defines as 'fused.'" (Rec. Doc. No.

22, at PRU 369.)  The Appeals Committee directed Dr. Fallon to contact Dr.

DiCuccio for clarification; nevertheless, Dr. Fallon made the independent

determination that although Dr. DiCuccio's diagnosis was unclear, it was not

accurate.  It would have required minimal effort on Dr. Fallon's part to contact Dr.

DiCuccio for clarification.

Therefore, even if the objective medical evidence clearly supported Dr.

Fallon's position, the decision to disregard the Appeals Committee's

recommended plan to contact Dr. DiCuccio and then the Appeals Committee's

unexplained endorsement of Dr. Fallon's decision to disregard the plan, raises our

review of Prudential's decision to a moderately heightened degree of scrutiny under

Pinto.  We base our decision to heighten the scrutiny of our review only on this

decision.  The other improprieties in Prudential's decision making process, as

alleged by Rupert, are without merit for the reasons already discussed.

## B.  PRUDENTIAL'S DECISION TO DENY RUPERT'S LONG-TERM BENEFITS SURVIVES MODERATELY HEIGHTENED ARBITRARY AND CAPRICIOUS REVIEW

In its October 21, 2004 decision, Prudential awarded Rupert closed benefits

for her self-reported symptoms of headache and depression and terminated benefits effective December 17, 2004.  The issue for us to review under moderately heightened scrutiny is whether the decision to terminate Rupert's benefits effective December 17, 2004 was arbitrary and capricious.

A court may not substitute its own judgment for that of a plan administrator under either the deferential or heightened arbitrary and capricious standard. Stratton, 363 F.3d at 256.  A "plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan."  Id. (citations omitted).

In order for Rupert to be entitled to benefits beyond the first 24-month period it was necessary for her to demonstrate that she was "unable to perform the duties of any gainful occupation for which [she] [is] reasonably fitted by education, training or experience."  (Rec. Doc. No. 22, at PRU 250.)  Under the terms of the plan, the basis of Rupert's disability also had to be one that was not based on self-reported symptoms.  Rupert's initial 24-month disability award was based on headaches and depression, both based on self-reported symptoms.  We agree with defendant and find that plaintiff has misstated the issue before us at this time.  (See, e.g., Rec. Doc. No. 21, at 24, ¶ 2.)  Therefore, the issue is whether it was arbitrary and capricious for Prudential to determine that Rupert's spinal condition,

rheumatoid arthritis, and colitis did not rise to a level of severity to render her totally disabled from *any* occupation.  Prudential also found in its final decision that plaintiff was not under regular care of a doctor whose speciality is the most appropriate for her disabling condition as required under the Policy.

We find that Prudential did not arbitrarily and capriciously deny Rupert's long-term benefits.  Throughout the process Prudential repeatedly requested from plaintiff objective medical evidence to support the findings of her treating physicians.  As we have already noted Prudential was not bound by a Social Security finding or the findings of Rupert's treating physicians where Prudential's reviewers repeatedly requested objective medical evidence to support the finding of Rupert's disability.  Prudential found that after reviewing the medical evidence, Rupert's condition did not meet the severity that would render her disabled from any occupation as is required for her to recover long-term disability beyond the initial 24-month period.  Prudential's determination was not arbitrary and capricious where the insurance company was never provided with the evidence it requested to substantiate her treating physicians' claims, and the independent neurologist reviewing Rupert's medical file disagreed about the severity of her condition.

Furthermore, we agree that Rupert is not under the regular care of a doctor whose speciality is to provide the most appropriate treatment for her disabling

condition under the terms of the policy.  Rupert has only seen a neurologist once, has not consulted with a rheumatologist regarding her sero-negativity, nor has she received psychiatric care for her depression.  These are all factors that the independently reviewing neurologist found demonstrated a lack of medical documentation of Rupert's total disability.

## CONCLUSION:

Therefore, Prudential's decision to terminate Rupert's benefits under a moderately heightened standard of arbitrary and capricious review was appropriate. While Rupert has repeatedly relied on the conclusions of her treating physicians to assert she is totally disabled, Prudential's decision was neither arbitrary nor capricious.  The record demonstrates that the insurance company repeatedly requested further documentation from Rupert, which was often not provided.

On the basis of the record before the Plan administrator, Prudential eventually found that Rupert was entitled to benefits for the initial 24-month period. That finding was based on self-reported symptomology of headaches and depression.  Under the terms of the plan Rupert was required to show more in order to continue receiving long-term benefits beyond the initial 24-month period.

The plan administrator carefully allowed Rupert several opportunities to supplement and provide further evidence to support a claim of total disability

beyond the 24-month period.  Rupert failed to provide objective medical evidence

to warrant disability beyond the 24-month period.  And although Prudential's

Appeals Committee failed to follow its own suggested course for resolving Dr.

DiCuccio's report during the end of the administrative appeal process, the ultimate

decision to deny benefits was not arbitrary and capricious in light of the objective

medical evidence on which Prudential made its decision.  Even the decision to not

contact Dr. DiCuccio was based on Dr. Fallon's review of the objective medical

evidence.  As Prudential indicated in its final decision, based on the record before

the plan administrator, Rupert's condition was not severe enough for her to be

considered totally disabled under the terms of the plan.


                                          _s/ James F. McClure, Jr._
                                          James F. McClure, Jr.
                                          United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHIRLEY RUPERT,                        :
                                       :
            Plaintiff,                 :        Case No. 05-CV-1022
                                       :
v.                                     :
                                       :        (Judge McClure)
THE PRUDENTIAL                         :
INSURANCE COMPANY,                     :
                                       :
            Defendant.                 :

**O R D E R**

April 7, 2006

For the reasons set forth in the accompanying memorandum:

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Pursuant to <u>Pinto</u>, the court applied a moderately heightened degree of

        scrutiny in our arbitrary and capricious review of Prudential's

        decision.  We heightened our review because of Prudential's Appeals

        Committee's decision in October 2004 to not contact Dr. DiCuccio

        for clarification of statements in his reports after deciding that would

        be the first step to resolve confusion on the issue.

2.      Defendant's motion for summary judgment is granted.  (Rec. Doc.

1

No. 15.)

3.     Plaintiff's motion for partial summary judgment is denied.  (Rec. Doc.

No. 18.)

4.     Final judgment is entered in favor of defendant The Prudential

Insurance Company and against plaintiff.

5.     The Clerk is directed to close the case file.


    s/ James F. McClure, Jr.
James F. McClure, Jr.
United States District Judge

2